DOROTHY P. B. CARUSO, administratrix, complainant-appellant, and DOROTHY P. B. CARUSO, complainant-respondent,

v.

RODOLFO CARUSO et al., defendants-respondents; ENRICO CARUSO, JR., and GLORIA CARUSO, defendants-appellants.

[Decided February 3d, 1930.]

*Messrs. McDermott, Enright & Carpenter (Mr. John M. Enright,* of counsel), and *Messrs. Treacy & Treacy,* for Dorothy P. B. Caruso, administratrix, complainant-appellant and respondent.

*Mr. Alfred F. Seligsberg* (of the New York bar), for Dorothy P. B. Caruso.

*Mr. Frederic R. Coudert* (of the New York bar, on the brief), for Dorothy P. B. Caruso, individually.

*Mr. Martin V. Bergen,* for Gloria Caruso.

*Mr. Merritt Lane* and *Mr. John L. Griggs,* for Enrico Caruso, Jr.

*Mr. Louis B. LeDuc (Mr. John Dashiel Myers,* of the Philadelphia bar, on the brief), for Victor Talking Machine Company.

The opinion of the court was delivered by

KALISCH, J.

The basic fact which led to litigation in the courts of this state, was a contract, entered into, and to be performed in this state, by the famous tenor, Enrico Caruso, in his lifetime, with the Victor Talking Machine Company, a corporation of this state, whereby it agreed to pay a royalty of ten per cent. on all sales of the Caruso singing records, for an indefinite period of time, and under which contract, the Victor com-

pany had already paid royalties after Caruso's death, for the years 1921 and 1922, amounting to more than $500,000, to his widow, Dorothy Park Benjamin Caruso, who had been appointed administratrix of the personal effects of her deceased husband, in the city of New York, by the surrogate of the county of New York; and upon the faith of the letters of administration issued to her in that jurisdiction, letters ancillary were granted to her, in this state, by the prerogative court.

Enrico Caruso was a native of Italy. He was born in Naples and died there August 2d, 1921. He was a citizen of Italy and he was domiciled there at the time of his decease. He left him surviving his wife, Dorothy Park Benjamin Caruso, to whom he was married August 20th, 1918, and Gloria, an infant daughter of a very tender age. He also left him surviving two natural sons, Rodolfo and Enrico, Jr. They were acknowledged by Caruso as his offspring, and by his will as his heirs, but, because they were by a mother who at the time of their conception and birth was married to another, they were not entitled to inherit from their putative father, under the Italian law, in case of his intestacy. He also left a brother, Giovanni Caruso, and a step-mother, Maria Castaldi. Rodolfo was of full age, and Enrico, Jr., was twenty years old.

On January 4th, 1919, Caruso made and executed a holographic will, whereby he devised and bequeathed his entire estate to his sons, Rodolfo and Enrico, Jr., and to his brother Giovanni as his universal heirs, bequeathing to his wife that portion of his estate which under the Italian law she would have been entitled to receive, by reason of her marriage; and the will also provided that the step-mother, Maria Castaldi, shall be provided for out of the estate until her death.

Gloria was born in New York on December 18th, 1919, nearly a year after the making of said will. No later will by Caruso was found. The will and a duplicate thereof were deposited with a notary public, at Naples, in the presence of the pretor, on August 8th, 1921. The validity of the will having been drawn into question, as well as the rights of the

beneficiaries, the widow and her infant child, Gloria, on August 10th, 1921, the widow filed a petition with the civil and penal tribunal of Naples for the appointment of a special guardian for the infant Gloria, pursuant to the requirement of the Italian Civil Code. Two days later, the tribunal made an order appointing one, Canessa, as special guardian of ·the minor Gloria, which order of appointment, *inter alia,* recites "to assist her [the infant] only in those acts in which conflicting interest with her mother may arise."

As to Enrico Caruso, Jr., who was also a minor, no such proceeding was necessary, since he had no parent with whom a conflicting interest could arise, his legal status being provided for under a different provision of the civil code.

Under the Italian law, the birth of Gloria rendered the will made by Caruso, on January 14th, 1919, a nullity. By virtue of paragraph 252 of the civil code a family council was constituted. This council was presided over by a district judge. It appointed one Manlio, as guardian of Enrico, and the proceedings there had were approved by. the civil and penal tribunal of Naples, by a decree of August 26th, 1921. Subsequent thereto, all the parties in interest, and the guardians of the two infants entered into a negotiation for the settlement of the estate wherever situate, to be embodied into a family agreement, to be submitted to the tribunal for approval. A family agreement was reached and entered into between all the parties in interest, and the guardians of the two infants, and after undergoing certain formalities required by the Italian law, the family agreement was submitted for approval to the Naples tribunal, which on June 16th, 1922, decreed *inter alia,* as follows: "Authorize the Victor Talking Machine Company to pay each year the ten per cent. due Comm. Enrico Caruso, as follows: one-eighth to Mrs. Dorothy Park Benjamin Caruso, one-eighth to Mr. Giovanni Caruso, one-eighth to Mr. Rodolfo Caruso, one-eighth to Mr. Enrico Caruso, a minor, and of the remaining four-eighths due to the minor, Gloria Caruso,. to apply two-eighths without retriction to Mrs. Dorothy Caruso, as mother, tutor, and legal administratrix of the property of her minor daughter, Gloria

Caruso, until her coming of age, and to deposit the other two-eighths in the Banco di Napoli, at its New York office in the name of Gloria Caruso with a pupilary restriction."

The attack made upon the validity of the proceedings in the Italian court, for lack of jurisdiction, is not a matter which can be properly entertained by us.

It is not denied that the civil and penal tribunal of Naples is a court of general jurisdiction, and was invested with the powers such as were exercised by that tribunal in the matters relating to the intestate's estate, and the claim made, on behalf of the infant, by its *guardian ad litem,* is, in substance, that the tribunal was without jurisdiction in the instant case, because the venue of the proceedings should have been laid within the territorial jurisdiction of the civil and penal tribunal of Florence, and contending that that city was the last domicile of the intestate, which statement, however, is disputed. This, obviously, was a matter for the Italian court to examine into and decide, if the question had been raised there, but, at any rate, is not for us to take notice of, or to pass upon here.

There is nothing appearing in the record before us to indicate upon what theory letters of administration were granted to the widow in the city of New York, for, if the family contract, which received the judicial sanction, and was embodied in the decree of the court of Naples is to have legal force and effect, in those states wherever there was any property belonging to Caruso, subject to be distributed, the contract between the parties, sanctioned by that decree, and adopted therein, was a final judicial determination of how such property should be administered and distributed, without the intervention of an intermediary. Of course, if there was a creditor of Caruso's estate, and assets in New Jersey, by virtue of our statute, in the absence of administration having been applied for by those entitled thereto, within a period of time designated by the statute, a creditor could properly apply for letters of administration. But, according to the record in the case, there was no creditor in New Jersey, and no property belonging to the Caruso estate, except the usufruct

arising from the Victor talking machine contract, and that was to be distributed among those entitled to share therein, according to the terms of apportionment stated in the contract, and as agreed upon by all the parties in interest, and ratified by the Naples tribunal, and as set forth in its decree, and, hence, there was no basis for the appointment of the widow, because of the fact that she was administratrix of Caruso's estate in New York, administratrix here, with letters ancillary. This, however, may be a matter of minor importance in view of the final result reached by this court in the final disposition of the appeals heard and considered by us.

On February 25th, 1927, the widow, Caruso, as administratrix, filed her petition in the court of chancery, and after setting forth that she was appointed ancillary administratrix, by the ordinary of the prerogative court, and that she had given bond in pursuance of such order for the sum of $250,000, and that she had received certain moneys from the estate of Enrico Caruso, as such administratrix, she prayed that her accounts as such might be settled, and that a decree be made for the distribution of moneys in her hands to the persons entitled thereto. She further set forth that the annual expenses of maintaining the household in the manner to which the infant Gloria is accustomed, including the moneys the petitioner has expended for the support and maintenance and education of Gloria, amount to about $30,500, and that she, as ancillary administratrix, be authorized to pay from the funds in her hands the sum of $30,500 per annum to herself, as mother, guardian and administratrix of Gloria, and to charge the same against Gloria's interest in the estate, &c. At the time of the filing of the petition, the petitioner was not appointed as special guardian of Gloria.

On January 24th, 1928, Chancellor Walker, as ordinary, sitting in the prerogative court, appointed Gloria's mother, as special guardian, for the express purpose of permitting the latter to apply to the court for an allowance from her daughter Gloria's estate, for the latter's support, maintenance and education, according to her condition in life, the ordinary reserving the amount of the bond to be given by the

guardian until he should have adjudicated the matter of allowance applied for by her.

On April 10th, 1928, the ordinary decreed, *inter alia*, "that the sum of $1,000 per month be allowed to the said Dorothy P. B. Caruso, as special guardian, for said Gloria Caruso, and that that sum be paid by the complainant, Dorothy P. B. Caruso, as administratrix of the estate of Enrico Caruso, deceased, to the said Dorothy P. B. Caruso, as special guardian aforesaid, said allowance to commence as of the date of the filing of the petition herein, namely, February 25th, 1927, and to continue until the further order of this court in the premises" * * * that said payments be made on the 25th day of each month in advance, and that the accumulated payments to and including March 25th, 1928, amounting to the sum of $14,000 be made in one sum * * * that Hudson County National Bank be, and it hereby is authorized and directed to pay the above sums of money out of the moneys on deposit with it from time to time, subject to the order in the above-entitled cause, upon checks or drafts of the said Dorothy P. B. Caruso, as ancillary administratrix of the estate of Enrico Caruso, deceased, which checks or drafts shall not need counter signature.

On the 4th day of January, 1929, the chancellor, by a final decree, ordered that Dorothy P. B. Caruso account to the court of chancery for all moneys received by her as ancillary administratrix, under appointment of the ordinary of the State of New Jersey, from the Victor Talking Machine Company, or from any other source, and the disbursements made by her therefrom and thereout. That of the amount remaining after the payment of expenses of administration, including such expenses of the suit as may be hereafter fixed and determined, two-thirds part thereof shall be paid to the infant, Gloria Caruso, as shall be hereafter ordered; one-twelfth thereof to Dorothy P. B. Caruso, one-twelfth thereof to Giovanni Caruso, one-twelfth to Rodolfo Caruso, and one-twelfth thereof to Enrico Caruso, Jr. That upon the coming in, passing and approval of the account of the complainant, and upon making the payments aforesaid, said complainant

may be discharged as ancillary administratrix as aforesaid. The learned chancellor then further decrees "that a trust exists under the contract made between Enrico Caruso in his lifetime, and the Victor Talking Machine Company, bearing date January 1st, 1919," and after stating that no trustee will be appointed in substitution for the Victor Talking Machine Company, orders that all subsequent payments to be made under said contract, shall be paid by the Victor Talking Machine Company in the proportion above stated, and that the Victor Talking Machine Company shall make no payments to any of them until further order of the court, and in the meantime, the Victor company shall deposit all payments in the Camden Safe Deposit and Trust Company as depository, to be distributed under an order of the court of chancery.

It becomes quite evident from a plain reading of the contract, designated as the family contract, and which in all its terms was approved, and was merged into a decree of the Naples tribunal, that that decree fixed with definiteness the proportionate share which each of the parties in interest named in said contract and decree was to receive from the usufruct arising from the contract of the Victor Talking Machine Company; therefore, there seems to have been no substantial reason for any intervention of the courts of this state, on behalf of those who had a beneficiary interest in that contract, or to appoint an administratrix with letters ancillary, or a special guardian for Gloria, or a trustee for the Victor Talking Machine Company.

We deem it to be wholly unimportant, in considering the questions presented on the appeals and cross appeals, whether or not the usufruct arising from the Victor Talking Machine Company's contract be considered as principal or income.

The prime question that presents itself, at the very threshhold of this litigation, for decision, is whether the distribution of the usufruct arising from the Victor Talking Machine Company's contract is to be governed by, and in conformity with, the decree of the Naples tribunal, under the Italian law, or to be distributed under the statute of distributions of this state, in which the contract referred to had its origin, exists, and is to be performed.

It is conceded that the domicile of the intestate was Italy; therefore, it seems to be inconsequential, so far as the meritorious question to be decided is concerned, whether the intestate's domicile was in Florence or Naples, both cities being in the Kingdom of Italy, which circumstance calls for the application of the universally recognized legal rule, that the law of the domicile of one dying intestate governs the distribution of his or her personal property.

The learned chancellor, in his opinion, in answer to the contention made on behalf of the infant Gloria by her *guardian ad litem,* to the effect that the court of Naples had no jurisdiction to make the decrees in question, since the deceased was not domiciled there, but in the province of Florence, Tuscany, Italy, and after pointing out that the complainant contends to the contrary, that the domicile of the deceased was at Naples, and the tribunal of that province had power to appoint a special guardian for the infant, &c., says: "I should not assume, directly or indirectly, any appellate jurisdiction over the Italian court, and on this subject I deem it to be my duty to leave it where the Italian court leaves it, that is, assume the jurisdiction of the court of Naples to approve the family settlement, and for that matter, order a distribution of the estate, according to its decision, but I repeat, that does not give the decree validity in New Jersey, for the purpose of varying our positive law of distribution found upon public policy; and that as to the infant, must be the decision here."

The view here expressed is a corollary of a prior statement made by the chancellor in his opinion, and which is as follows: "Now, in conformity with the law which recognizes the validity of foreign judgments and decrees as matter of comity between sovereign states, I hold upon this final hearing that the original decree of the Italian court, ordering distribution generally of the assets of the estate of Enrico Caruso, deceased, is valid here, save so far as it conflicts with the distribution declared in New Jersey for the benefit of the infant, Gloria Caruso, who, under our law, acquires a far better standing than she does under the Italian decree"

\* \* \* and because of the latter circumstance, the court concludes that "the consent given by her guardian in Italy to the decree of that kingdom's court, cannot be accepted by the courts of this state."

This reasoning presents a palpable incongruous situation in that while it recognizes the validity of foreign judgments and decrees, as a matter of comity between sovereign states, it denies their legal efficacy in a case where an infant is concerned, though the acts of the infant were performed in accordance with the laws of such foreign jurisdiction, and formally adjudicated by a final decree or judgment of the courts of such foreign state.

Furthermore, it thrusts a startling solecism into the action of the court of chancery, for after it had declared that by reason of the comity existing between nations, credit must be given to the decrees or judgments of foreign tribunals, it then proceeds to make a substantially different contract, for and without the consent of the parties in interest, except Gloria's, from the contract which was made the basis of the Italian decree.

The chancellor, as such and as ordinary, undertakes to settle judicially, against the express terms of the decree of the Naples tribunal, as to what each of the distributees is entitled to receive, based upon his view that the Italian law did not allow as much to the infant as she would be entitled to receive under the law of this state. But even so, it is difficult to perceive upon what sound legal theory the court of chancery was authorized to reform the decree of the Italian court and make a decree which increases the amount that Gloria is to receive as distributee, and thus correspondingly lessen the amount which each of the other distributees was to receive under the Italian decree.

It needs only a moment's consideration to perceive the repugnancy of such a view to the universally accepted doctrine relating to the legal effect of judgments or decrees, obtained in foreign jurisdictions, as recognized and adopted by the courts of this state. A diligent search fails to disclose any well-considered case that undertakes to differentiate be-

tween the validity of the acts of an infant, and those of an adult, when performed in a foreign jurisdiction, where the infant was represented by a guardian duly appointed, as here, and the transaction had received the approval of its guardian, and the sanction of the court. It may be safely assumed that in all civilized countries, the rights of an infant will be safe-guarded and protected by law. The fact that the law of a particular jurisdiction within which the *res* is located is more beneficial to the infant in the distribution of personal property of an intestate than that prevailing in the state or country of the intestate's domicile, cannot properly be made a test as to when and when not a judgment or decree of such foreign jurisdiction, involving the rights of an infant, shall become enforceable in this state, without prejudicially impairing the legal force to be given to the universal doctrine relating to foreign judgments, adopted by the courts of this state.

The logical sequence of adopting, in behalf of infants, the exception to that doctrine, as suggested and applied by the chancellor to the instant case, manifestly will tend to unsettle the finality, the good faith and credit to be given to judgments of foreign, as well as sister states, and allow the propriety of final judicial action of foreign courts to be challenged and reviewed by our own tribunals, according to the law of the forum of each particular state in which the matter may be stirred.

The theory on which the exception, in behalf of infants, to the application of the universal doctrine relating to foreign judgments is attempted to be maintained, is that the exception is in support of a public policy of this state, and hence, to give credit to, and to enforce the judicial action of the Italian tribunal, would be in violation of such public policy. This is a palpable fallacy.

If such an exception as contended for by counsel of the *guardian at litem* to the universal doctrine relating to the legal effect to be given to a foreign judgment or to a contract, valid in the jurisdiction where made, exists in favor of an infant in this state, upon grounds of public policy, it

is significant that there is an utter absence of any judicial pronouncement of our courts to that effect. No countenance is given to any such exception by our decisions. The contrary is to be gleaned from cases decided by this court, where the legal principle involved and to be applied to the facts of the instant case finds its true analogy to the legal principle adopted in those cases later on referred to and considered.

According to the view expressed by the court of chancery, the disability of an infant to enter into a contract, disposing of his property rights, though entered into with due formality, as required by the foreign law, unless the benefit enuring to the infant under such contract is equal in amount to what the infant would be entitled to receive under the statute of distribution of this state, made the contract one against public policy, and not enforceable in our courts.

About fifty years ago a like contention was made on behalf of a married woman who, while laboring under the common law and statutory disabilities relating to married women, whereby they were disabled from entering into a valid contract, *et cetera,* in this state, had entered into a contract in a foreign state, where no such disabilities of married women existed. It was held by this court that such contract was enforceable in this state, and was not against public policy.

In *Wright* v. *Remington, 41 N. J. Law 48,* the facts of the case disclose that an action was brought in this state to enforce an obligation arising out of the making of two promissory notes, which were signed by husband and wife, in Chicago, and payable at the same place, and there was proof that the wife signed the note as surety for her husband. Under the law of the state of Illinois, a married woman could become surety for her husband. Under the law of this state a married woman could not. In an action brought here to enforce the obligation resulting from the wife's contract of suretyship, there was a verdict for the defendants, and the trial judge of the circuit court, where the case was tried, requested an advisory opinion of the supreme court, regarding the legal efficacy of the defense set up by defendants, namely, that under the law of this state, a married woman could not

enter into a valid contract of suretyship for another, though under the law of the State of Illinois she could, but since the contract of suretyship was in violation of the law of this state, it was unenforceable here. The supreme court, in an opinion by Mr. Justice Reed, held that the defense set up as a bar to a recovery was not good. The learned jurist, after briefly stating the facts, and the legal rule to be applied, at page 51 said: "It is, therefore, the duty of the courts of this state to recognize and enforce it, unless it appears injurious to the interest of the state or our citizens. But nothing approaching this result can be deduced solely from the fact that the foreign statute confers upon a married woman the power to make a contract of suretyship." * * * "But whatever may be our opinion of the policy of legislation beyond our state, we are bound by the principles of comity to recognize its validity, unless it clearly contravenes the principles of public morality or attacks the interests of the body of the citizens of our state."

In *Thompson* v. *Taylor, 66 N. J. Law 253, 260,* Mr. Justice Garrison, writing the opinion for this court, cites with approval the reasoning of Mr. Justice Reed in *Wright* v. *Remington, supra.*

The legal principle applicable to the facts of the instant case, to be extracted from the cases referred to, and those which are to follow, is that where the legislation of a foreign state, or the judgment or decree of a foreign tribunal, recognizes and sanctions the validity of the act of an infant, performed by it, within its jurisdiction and according to its law, relating to the succession of personal property of an intestate domiciled in such foreign jurisdiction, such personal property, having a *situs* in this state, is solely subject to be distributed according to the law of the domicile of the intestate, unless it appears that to do so would clearly contravene the principles of public morality or attack the interests of the body of the citizens of our state.

In *Harral* v. *Harral, 39 N. J. Eq. 279,* decided by this court in 1884, the facts, briefly stated, were as follows: Frederick Harral was born in Connecticut in 1842. He went

to France in 1873. In 1877 he was married to Clarice-Marie
LeGars, a French woman. He returned to this country in
1878, and went to the house of his brother-in-law, in Engle-
wood, New Jersey, where he lived for a while, and upon a
petition filed in the court of chancery by his brother, that
Harral was incompetent to manage his property, &c., a com-
mission in the nature of a writ *de lunatico inquirendo* was
issued to inquire into Frederick's sanity, and he was found
to be of unsound mind, and taken to a lunatic asylum in
Philadelphia, where he remained up to the time of his death
in 1881. Before going abroad he made a will, leaving all his
property, both real and personal, to his brothers and sisters.
The will was probated in New Jersey, all his personal prop-
erty being located in this state. Notwithstanding the will,
the widow filed a bill in the court of chancery, claiming she
was entitled to one-half of the personal estate of the decedent,
because, at the time of the marriage, her husband was domi-
ciled in France, and that by the laws of that country the
property of the husband and of the wife became community
property, unless they made a contract providing otherwise,
and that under the community law of France, the wife, on the
death of the husband, was entitled to one-half of his estate,
and hence, she was entitled to receive from the executors, one-
half of the personal estate of which her husband died pos-
sessed. The court of chancery, in an opinion by Chancellor
Runyon, held that the domicile of the husband being in
France at the time of the marriage, the community prop-
erty law in that country was binding upon both parties to
the marriage contract. The cause was appealed to this court,
which, in an opinion by Mr. Justice Depue, in confirming
the views expressed by Chancellor Runyon, declared, in sub-
stance, that a citizen of this country might adopt another
country as his domicile without becoming naturalized as a
citizen of that country; that by his marriage in France, and
his establishment of his conjugal domicile there, his personal
property became subject to the community law, and that his
widow, on his death, was entitled to the one-half part thereof,
notwithstanding that by the will, made before the marriage,
he bequeathed the whole of it to others.

The fundamental legal principle that controls the decision of that case applies with equal force to the facts of the case *sub judice.*

The mere circumstance of the infancy of Gloria cannot properly have the legal effect, in any reasonable aspect, of impairing the salutory legal doctrine, relating to the legal acts of individuals, whether they be adults or minors, where such acts are recognized as legal by and under the laws of the country in which they were performed.

Moreover, Gloria had not only her mother, representing her as her general guardian, at the family council, to safeguard her, Gloria's interest in the Caruso estate, but she had also, in order to fully protect her interest therein, a special guardian, and one who had no interest in the estate, appointed by the Naples tribunal, in her behalf, so as to more effectually safeguard her rights, wherever and whenever they might be in competition and conflict with her mother's rights in the estate.

If we pause for a moment to reflect upon the logical effect of permitting an exception of the character evolved and acted upon by the court of chancery in the instant case, it will be at once perceived that the spirit of the *entente cordiale* existing between civilized nations, and which is a part of the *jus gentium,* will be seriously and prejudicially disturbed, if not wholly stripped of its salutary efficacy. And right here is a proper place to call attention to the fact that the clause that "full faith and credit shall be given in each state, to the public acts, records and judicial proceedings of every other state," to be found in the federal constitution, had its origin in the common law, and became early in the development of the law of nations, one of its conspicuous and controlling features.

In *Ennis et al.* v. *Smith et al., 14 How. Law Ed. 398,* Mr. Justice Wayne, speaking for the supreme court of the United States, at page 423, said: "For several hundred years, upon the continent and in England, from the reported cases for a hundred years, the rule has been that personal property, in cases of intestacy, is to be distributed by the law of the domi-

cile of the intestate at the time of his death. It has been universal for so long a time that it may now be said to be a part of the *jus gentium*. Lord Thurlow speaks of it as such in the house of lords in the case of *Bruce* v. *Bruce*. Erskine, in his *Institutes of the Law of Scotland, B. 3 tit. 9 § 4 p. 644,* says this rule is founded on the laws of nations."

At page 430, the learned justice, after reciting the proceedings which were taken in foreign countries, says: "It has been determined that the domicile of General Kosciusko was in France, at the time of his death, that he died intestate as to his funds in the United States, and that they were to be distributed according to the law of his domicile." And again, after commenting upon the proofs and decrees of the court of nobility of Grodno, and another of the court of Kobryn in the Russian province of Lithuania, and of the rights of the heirs thereunder, says: "It is not a judgment *inter partes,* but a foreign judgment *in rem,* and is evidence of facts adjudicated against all the world. The decree from the court of Kobryn is also proved to be a judicial record. From both we learn that the persons named in the bill of the complainants are the collateral kinsmen of General Kosciusko. By the laws of France they may take his estate by succession."

*Dicey on the Conflict of Laws, 1896 Ed.* (at *p. 56*), lays down the prevailing general principle, and cites leading English cases in support thereof, as follows: "that the nature of a right acquired under the law of any civilized country must be determined in accordance with the law under which the right is acquired."

The learned author at pages 682 and 683 says: "The universal doctrine, now recognized by the common law, although formerly much contested, is, that the succession to personal property is governed exclusively by the law of the actual domicile of the intestate at the time of his death  *  *  * It is of no consequence what is the country of the birth of the intestate, or of his former domicile, or what is the actual *situs* of the personal property at the time of his death; it devolves upon those who are entitled to take it as heirs or

distributees, according to. the law of his actual domicile at the time of his death."

In *Carr* v. *Francis Times & Co. (1902), A. C. 176,* the house of lords said: "He has authorized it and declared authoritively that it was a perfectly lawful act, according to the law of Muscat, and I am of the opinion that no English tribunal is capable of going behind that declaration and saying that the sultan of Muscat was wrong in the exposition of his own law."

To the same effect in principle in addition to *Harral* v. *Harral, supra,* are the following cases in this state: *Banta* v. *Moore, 15 N. J. Eq. 97; Normand's Adm'r* v. *Grognard, 17 N. J. Eq. 425; Jenkins et al.* v. *Guaranty Trust & Safe Deposit Co., 53 N. J. Eq. 194.*

It is to be borne in mind, that the statute of distribution is limited solely to the distribution of personal property of a person dying intestate, his or her domicile being in this state, at the time of decease. Accordingly, such property must be distributed as the statute directs. The order of distribution is not made by any authority or power, inherent in the court, but is solely derived from the statute. See *In re Estate of James Eakin, 20 N. J. Eq. 481* (at *p. 486*) ; *Smith* v. *McDonald, 71 N. J. Eq. 261* (at *p. 262*).

The statute of distribution was never designed to govern the disposition to be made of personal property, the *situs* of which is in this state, of the person domiciled and dying intestate in a foreign state or country. Neither the prerogative court, nor the court of chancery was clothed with any power to extend the operation of the statute, so as to include the distribution of the property of an intestate domiciled and dying in a foreign jurisdiction, even though there were property rights of a minor in such property.

As has been previously intimated, there was no good reason for the appointment of an administratrix with letters ancillary. Such a course was unnecessary, since the only asset in this state was the contract with the Victor Talking Machine Company yielding royalties enuring to the benefit of those persons expressly designated in the family contract, and

as embodied in the Italian decree, which decree in unequivocal terms points out to whom and in what aliquot part such royalties due and to grow due shall be paid by the said Victor Talking Machine Company.

While it is true that no appeal was taken from the order appointing an administratrix with letters ancillary, nevertheless, the question of the regularity and necessity of such appointment in the present case is inseparably entwined with the matters presented upon an appeal taken from the decree of the chancellor directing the administratrix to file an account, in that, as to whether or not in the accounting the administratrix be allowed to deduct from the funds in her hands anything more than actual disbursements made by her, if any, in the matter.

In our view of the case the interposition of an administratrix was wholly unnecessary in order to deal properly with the asset of the personal property—the Victor Talking Machine Company contract, in accordance with the settled law of this state. The decree of the Naples tribunal pointed the way, and it should have been followed.

We now approach a consideration of the question raised upon the appeal from an order of the ordinary appointing the mother of Gloria as the latter's special guardian.

This appointment we deem to be wholly without any warrant in law. The ordinary relies for a justification of such appointment on section 43 of "An act to amend an act, entitled, 'An act respecting the orphans court and relating to the powers and duties of the ordinary, and the orphans court, and surrogate,' " &c. *P. L. 1924 p. 68.* That section reads:

"The ordinary shall have full authority to appoint a special guardian for the property, real or personal, within this state of any non-resident minor * * * shall have authority to control, remove or substitute such guardian, and in any case not already provided for by statute or the rules of the court, the court shall take such action in the matter as it shall deem most for the advantage of the infant * * * provided, that a limited guardian shall not be appointed under the provisions of this section, if there is a general guardian for such minor legally qualified and acting on his or her behalf within this state."

The ordinary appointed Gloria's mother as the former's special guardian. Neither Gloria nor her mother was or is a resident of this state. The statute permits the appointment of a special guardian for a foreign infant. It does not authorize the appointment of a foreign guardian for a foreign infant. It is quite obvious that the sense of the legislative body expressed in plain terms, goes no further than to invest the ordinary with the power to appoint a special guardian for a foreign infant, and that authorization clearly does not carry with it the slightest implication of authority for the appointment of a foreign guardian.

It is manifest, that if a foreign guardian may be properly appointed for a foreign infant, then there is no obstacle in the way of the ordinary to appoint a person as such special guardian who resides in California, or in any other sister state. If this can be properly done, then there is nothing to prevent the court from appointing a special guardian for a foreign infant, irrespective of the fact, whether his or her residence be in one of the countries of Europe, Asia or Africa, &c. Such an extraordinary situation was not contemplated by the law-making power of this state.

As a matter of sound sense and in the interest of justice, it is absolutely necessary in order for a court to keep control of and exercise proper supervision over the conduct of its appointees in the performance of their duties arising out of a guardianship, that the appointee be a resident of this state, in order that he or she may be subject to the order of the court and summarily dealt with, for any dereliction of duty, and thus be made to personally submit to the court an account for his or her acts and be amenable to all processes for contempt, &c. It is obvious if the guardian be without the jurisdiction of the state, the court is rendered powerless to enforce its decree against him personally.

We are also of the opinion that the Victor Talking Machine Company was an unnecessary party to the proceedings had in this case. There was no trust existing between the Victor Talking Machine Company and the distributees under the foreign decree, the status being that of creditor and debtor.

There was no basis whatever for the appointment of the said company as trustee. The decree of the Naples tribunal points out to whom and in what proportion the sum due or to become due as royalties arising out of the contract, shall be paid, namely, the said company shall pay to each of the distributees, as directed by the decree. The company is obligated to pay annually, ten per cent. of the amount of the list price of records sold or licensed.

We can see no difficulty in the way of the company to discharge this obligation in a full and complete manner, for all it has to do, is to make the payments to the distributees in accordance with the decree of the Naples tribunal. If a change is desired in this respect by the company, then the proper place to make such an application is not to the courts of this state, but to the Naples tribunal.

. The views expressed herein lead to the following result:

(1) The decree of the court of chancery, practically reversing the decree of the Naples tribunal as to the aliquot part which each distributee, under the Italian law is to receive from the royalties of the Victor Talking Machine Company contract, is reversed, and our direction is that each of the distributees designated in said decree is to receive the aliquot part of the royalties due and accruing from the Victor Talking Machine Company contract, as determined by the decree of the Naples tribunal, and in the manner as pointed out in said decree.

(2) That the administratrix with letters ancillary shall file an account of all the moneys received by her from the Victor Talking Machine Company as royalties arising out of the contract between it and Enrico Caruso, deceased, and to pay such moneys so received by her without any deduction therefrom into the court of chancery, to be distributed by the court of chancery among the distributees mentioned in the decree of the Naples tribunal, and as determined in that decree which is upheld by this court.

(3) That the order of January 24th, 1928, appointing Dorothy P. B. Caruso, mother of Gloria, as the latter's special guardian, is reversed.

(4) That the decree of April 10th, 1928, fixing allowances, &c., to the special guardian is reversed, and the petition filed by her in that regard dismissed.

(5) That the final decree of January 4th, 1929, is reversed and the bill is dismissed.

*For affirmance*—BLACK, J. 1.

*For reversal*—THE CHIEF-JUSTICE, PARKER, KALISCH, CAMPBELL, LLOYD, CASE, BODINE, VAN BUSKIRK, KAYS, DEAR, JJ. 10.